Anchor Grain Company, an Illinois Corporation, Plaintiff-Appellant, v. Jess Kail and Marion D. Kail, Defendants-Appellees.

Gen. No. 10,537.

Fourth District.

November 24, 1964.

Rehearing denied February 2, 1965.

Thomson, Thomson and Mirza, of Bloomington, and Richard Gillan, of Colfax, for appellant.

Costigan & Wollrab, of Bloomington, for appellees.

SPIVEY, J.

The plaintiff below appeals from a judgment entered on a jury verdict in the Circuit Court of McLean County, Illinois, in favor of the defendants in an action arising under a contract.

On September 2, 1959, the plaintiff, Anchor Grain Company, entered into a contract of purchase with the defendants, Jess Kail and Marion D. Kail, then doing business as McLean County Feed, Seed and Grain Company.

By that agreement the plaintiff purchased the entire business of the defendants consisting of, inter alia, real estate, buildings, furniture and fixtures for the sum of $87,500. Possession was delivered to plaintiff on October 1, 1959, after payment of $30,000.

There were three grain storage bins upon the premises, containing corn on which warehouse receipts had been issued to the Commodity Credit Corporation.

In their agreement it was provided by Paragraph 10: "Vendor further agrees that he will assign unto the Vendee all of his rights in Commodity Credit Cor-

poration grain storage agreements and that effective October 1, 1959 all storage income by reason of said agreements shall become the property of the Vendee and Vendor further agrees that in the event the corn in Commodity Credit Corporation storage as represented by warehouse receipts delivers out with a shrink of greater than 1½% of the amounts contracted with Commodity Credit Corporation, then Vendor will reimburse said Vendee for such amounts as Vendee expends to purchase corn to bring said shrink within 1½%. Vendee agrees to notify the Vendor in writing at least two days prior to the date of emptying said bins."

There is no disagreement between the parties that the warehouse receipts issued represented the storage of 100,225.77 bushels in the East Pole Bin, 95,043 bushels in the Metal Star Bin, and 103,333.17 bushels in the North Pole Bin.

Between March 28, 1960, and April 15, 1960, the East Pole Bin was emptied, delivering out 96,070.38 bushels, representing 4,155.39 bushels less than was represented to be contained in that bin.

On May 1, 1960, the parties entered into another agreement wherein it was recited that at the instance of the defendants the plaintiff agreed to pay the sum of $50,000 (then not due) on its note to the defendants in the amount of $57,500.

In this latter agreement, in dealing with the 4,155.39 bushel shortage in the East Pole Bin, credit was given in the amount of $2,577.13 on plaintiff's note to defendants. This amount was arrived at by crediting defendants with the 1½% allowance provided in Paragraph 10 of the agreement plus 351.01 bushels found to be moldy, rotten corn and dirt swept up out of the bin. After these allowances there remained a shortage of 2,301 bushels at $1.12 per bushel, being the $2,577.13 credited to plaintiff's note.

This latter agreement provided, among other things, that Paragraph 10 of the original purchase contract would remain in full force and effect. It further provided by Paragraph 3: "It is further agreed that Second Party is entitled to an immediate credit on said note of $9,344.90 of the sum of $2,577.13 and that said credit has been endorsed on said note effective May 1, 1960. It is further agreed that any further adjustments concerning the matter of grain shortage or grain overrun shall be immediately adjusted between the parties as soon as determined and the remaining bins are emptied by credit being given on said note to Second Party in the event of shortage and payment being made by Second Party to First Parties in the event of overrun."

Between April 20, 1960, and May 24, 1960, the Metal Star Bin was emptied, delivering out 94,029.63 bushels representing 1,013.37 bushels less than was represented to be contained in that bin.

Between June 1, 1961, and June 28, 1961, the North Pole Bin was emptied, delivering out 89,446.07 bushels, representing 13,887.10 bushels less than was represented to be contained in that bin. After an allowance to the defendants of 380.71 bushels for moldy and rotten corn and dirt swept out of the bin, the shortage amounted to 13,506.39 bushels.

After giving credit to defendants for the 1½% allowance provided in Paragraph 10 of the agreement on the Metal Star Bin and the North Pole Bin the total shortage in the two bins amounted to 11,544.12 bushels.

On this basis of an 11,544.12 bushel shortage at $1.06 per bushel plaintiff claims a reimbursement of $12,236.76 under the contract and the supplemental contract.

Plaintiff's principal contentions are: (1) that Paragraph 10 of the contract and Paragraph 3 of the supplemental agreement are controlling and that the ver-

dict of the jury was against the manifest weight of the evidence, and (2) that the Court should have entered a judgment for the plaintiff notwithstanding the verdict.

■ "It is allowable always to look to the interpretation the contracting parties place on their agreement, either contemporaneously or in its performance, for assistance in ascertaining its true meaning. No extrinsic aid can be more valuable." Mitchell v. Illinois Cent. R. Co., 384 Ill 258, 266, 51 NE2d 271.

"It is well settled that the construction given by both parties to a contract which might otherwise be doubtful, is entitled to great weight." Groome v. Freyn Engineering Co., 374 Ill 113, 126, 28 NE2d 274.

A determination of what is meant by the wording "delivers out with a shrink of greater than 1½%" in Paragraph 10 of the agreement is of importance to this decision.

At the time of the supplemental agreement of May 1, 1960, neither the Metal Star Bin nor the North Pole Bin had been emptied.

Defendants, testifying in regard to the East Pole Bin, stated that the 4,155.39 bushel shortage in deliver out was occasioned by water damage, normal shrink and a 500 bushel loss due to a "bust out," but they had no idea of how many bushels were water-damaged.

Plaintiff's evidence with reference to the water-damaged corn in the East Pole Bin was to the effect that there were two spots, each about 15 feet in diameter and between one and two inches deep, and that each such area would involve about 100 bushels of corn.

In their settlement of the 4,155.39 bushel shortage in the East Pole Bin, 351.01 bushels were credited to the defendants for moldy, rotten corn and dirt swept out of the bin.

In analyzing this settlement, defendants have recognized a shortage of 1,801 bushels of corn unaccounted

134

for after crediting themselves with the 1½% allowance provided in Paragraph 10 of the agreement, a loss of 500 bushels by the "bust out," and an allowance of 351.01 bushels of moldy, rotten corn and dirt swept out of the bin.

■ By their agreement of May 1, 1960, which recognized a shortage of 2,301 bushels including the 500 bushels involved in the "bust out" in the East Pole Bin, after having given credit for the 1½% allowance on the deliver out as provided by Paragraph 10 of the agreement plus an allowance for moldy, rotten corn and dirt swept out of the bin, we believe the parties have placed upon their agreement a construction that the plaintiff shall be reimbursed for *shortages of any nature* above the 1½% allowance and any allowances for moldy or rotten corn.

This construction is further evidenced by the language of Paragraph 3 of the agreement of May 1, 1960, wherein it is provided "that any further adjustments concerning the matter of grain *shortage* or grain overrun shall be immediately adjusted between the parties as soon as determined and the remaining bins are emptied. . . ." (Emphasis supplied.)

No dispute seems to have arisen as to the amount of corn delivered out of the Metal Star Bin.

As to the North Pole Bin the amount of corn delivered out was verified by an agent of the defendants who was present at all times during the emptying of that bin.

■ Defendants wish to excuse the shortage of 13,887.10 bushels before the allowance of 1½% as provided by Paragraph 10 of the agreement by saying, (1) that an agent of the plaintiff had acknowledged a report made by an inspector for the Commodity Credit Corporation and the Illinois Commerce Commission of the presence in the North Pole Bin of 105,431 bushels, (2) that estimated calculations from outside

135

measurements of the North Pole Bin would indicate the number of bushels within the bin, and (3) that there was a possible purloining of corn by augering out of the North Pole Bin.

Both parties have testified that during their control of the bins neither had removed any corn nor added any corn following the filling of the bins.

In our judgment, to give credence to any evidence of an acknowledgment of a report by the plaintiff's agent or to estimates based upon the size of the bins would do violence to the agreements as interpreted by the parties, and the issues joined herein.

The suggestion that some of the corn might have been augered out of the North Pole Bin, without any semblance of positive proof to that effect, is too highly speculative to be of any value.

From this record we conclude that the verdict of the jury for the defendants was clearly against the manifest weight of the evidence.

We are now confronted with the question of whether or not the trial court should have honored the plaintiff's post-trial motion for judgment notwithstanding the verdict.

Upon such a motion we can consider only the competent evidence. (Hunter v. Troup, 315 Ill 293, 146 NE 321.) Evidence that has no probative force, whether objected to or not, cannot be considered. (Knudson v. Knudson, 382 Ill 492, 46 NE2d 1011.)

Considering the interpretation placed upon Paragraph 10 of the contract by the parties themselves, the supplemental agreement, the fact that there is no dispute as to the amount of corn represented by the warehouse receipts, the fact that it was either agreed or undisputed as to the amount of shortages of corn as delivered out of the bins, and the fact that there is no showing by competent evidence of any other removal during its shortage period compels us to say

the trial court should have entered a judgment for the plaintiff upon its application for a judgment notwithstanding the verdict in the amount of $12,236.76.

The judgment of the Circuit Court of McLean County is reversed with judgment here for the plaintiff and against the defendants in the amount of $12,236.76.

Reversed with judgment here.

CROW, P. J. and SMITH, J., concur.